**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**

**CYNTHIA GRAY**                                                          **PLAINTIFF**

**v.**                                    **3:05CV00065-WRW**

**THE PRUDENTIAL INSURANCE COMPANY**
**OF AMERICA**                                                          **DEFENDANT**

## ORDER

Plaintiff, Cynthia Gray, filed her Complaint under the Employee Retirement Income Security Act of 1974 ("ERISA")[1] seeking review of Defendant's decision to deny her claim for long term disability ("LTD") benefits. Plaintiff was eligible for the benefits under an employee welfare benefit plan ("the Plan") sponsored by her former employer, American Greetings, Inc., and insured by Defendant. Finding that Plaintiff's regular occupation had changed and, therefore, was not disabled as defined by the Plan, Defendant denied her benefits. The parties have filed cross-motions for summary judgment (Doc. Nos. 10 & 25). For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED. Defendant's Motion for Summary Judgment is GRANTED.

**I.      Background**

Plaintiff began working for American Greetings Corporation as a general factory worker on October 7, 1991.[2] In late 1998, Plaintiff noticed numbness in her fingers, weakness in both arms, pain in her shoulder blades, and headaches. Dr. Richard Kyle, a neurosurgeon examined her on

---

[1]29 U.S.C. § 1001 *et seq*.

[2]Doc. No. 9-2, PR-G467; The general factory worker position, as described by American Greetings, is one that includes standing 5% of the time, walking 95% of the time, stooping 20% of the time and lifting 20-30 pounds 30% of the time.

1

February 15, 1999, and again on February 24, 1999.  A CT scan revealed that Plaintiff had multiple cervical bulges.  Despite these findings, Dr. Kyle diagnosed Plaintiff with carpal tunnel syndrome,[3] for which he performed surgery on May 14, 1999.   Plaintiff took medical leave from April 1999 until December 17, 1999.

Before returning to work, Plaintiff saw a second physician, Dr. Tonyman.  After reading the CT scan as showing "multilevel cervical spondylosis," Dr. Tonyman asked Plaintiff to have some additional tests.  A myelogram performed on January 5, 2000, revealed that Plaintiff was suffering from "multilevel degenerative disc disease at C4-5, C5-6, and C6-7."  Dr. Tonyman placed Plaintiff on a 20 pound weight restriction but did not recommend surgery.  As a result of her various injuries, when Plaintiff returned to work, American Greetings assigned her to an "accommodated position," that required less bending, stooping, and lifting and allowed her to sit more often.[4]

Plaintiff had been in the accommodated position for over two years when American Greetings changed its accommodation plan and opted to no longer offer the position as of February 5, 2002.  Rather than find another position within American Greetings, Plaintiff immediately took medical leave under the Family Medical Leave Act ("FMLA") and applied for LTD benefits on February 8, 2002.  When Plaintiff exhausted her FMLA protected time on April 10, 2002, she went

---

[3]At "C3-C4 small posterior central HNP which is abutting the anterior aspect of the spinal cord, no compression of the spinal cord . . . At C4-C5 posterior central broad based disc bulging which is indenting the anterior thecal sac as well as abutting the anterior aspect of the spinal cord.  This bulging is causing mild spinal canal stenosis at this level with an AP diameter of 9mm . . . at C5-C6 posterior central broad-based disc bulging. This disc bulging is indenting the anterior thecal sac as well as abutting the anterior aspect of the spinal cord. This disc bulging is causing moderate spinal stenosis at this level with AP diameter of 7mm."

[4]Doc. No. 9-12, p. 12 or PR-G 601.

on a medical leave of absence.  When Plaintiff did not return to work within a year, she was terminated.

By letter issued on August 14, 2002, Defendant denied Plaintiff's request for LTD benefits. Plaintiff immediately asked for reconsideration; however, that request was denied on November 12, 2002.[5]  In its denial, Defendant noted that Plaintiff had not documented a change in her longstanding condition and reasoned that American Greetings' "inability to keep [her] in the Packaging Department" was the reason Plaintiff stopped working.[6]

After this, Plaintiff, with the help of newly retained counsel, informed Defendant by letter sent January 12, 2003, that she would like a third review of its decision.[7]  Due to the ongoing appeal process, Defendant granted Plaintiff an extension of time to file additional information by July 15, 2003.  Plaintiff argued that the underlying conditions that necessitated her subsequent surgeries existed during the policy elimination period.[8]   Nevertheless, on July 31, 2002, Defendant again

---

[5]Doc. 9-2, PR-G028; Meanwhile, Plaintiff continued to see Dr. Tonyman over several months for increased back pain.  After an MRI performed on July 20, 2002, revealed that her condition had worsened, Plaintiff had a right L4-5 hemilaminotomy and discetmony on September 18, 2002 and a cervical surgery on January 16, 2003.

[6]*Id*. ("In a September 10, 2002 office visit, Dr. Tonyman documents for the first time your symptoms of lower back pain.  On September 18, 2002, you underwent a discetomy/ lamienectomy at the L4-5 level. This is considered a second injury to your existing cervical condition as there is no record of low back pain or symptoms prior to the September 10, 2002 office visit and surgery.  While you may experience symptoms and continue to seek treatment for them, including surgical intervention, there is no documentation of an injury or sickness that caused you to stop working on February 5, 2002.").

[7]Doc. No. 9-2, PR-G031.

[8]*Id*.

3

determined that Plaintiff's reason for stopping work was the elimination of her accommodated position.[9]

On September 24, 2003, Plaintiff provided Defendant with records from Occupational Health Consultants of America.[10]   In response, Defendant sent a letter to Plaintiff's attorney on October 7, 2003, confirming that it had received the records from Occupational Health, and stating, "[i]t is unclear to our office if you intend for this documentation to constitute a third appeal, and if so if that appeal is complete."[11]   The letter requested that Plaintiff's attorney notify Defendant if the information was to be reviewed for an appeal.[12]   When Defendant received no answer, it again wrote Plaintiff's attorney on November 13, 2003, inquiring whether the September 24 document submission was intended to be an appeal.[13]

Plaintiff's counsel submitted a letter of appeal on December 17, 2003, but indicated that additional documentation was forthcoming.[14]   On January 6, 2004, Defendant sent a letter to Plaintiff's counsel explaining that it was unclear whether Plaintiff's claim submission was complete, or if Plaintiff planned to provide additional documentation on appeal.[15]   Defendant again requested that Plaintiff give them notification when her appeal submission was complete.  Then, on February

---

[9]Doc. 9-2, PR-G035.

[10]*Id.* at PR-G242.

[11]*Id*. at PR-G39.

[12]*Id*.

[13]*Id*. at PR-G40.

[14]*Id* at PR-G200.

[15]*Id*. at PR-G042.

3, 2004, Defendant sent a letter to Plaintiff's counsel memorializing that one of its claim managers had contacted counsel's office and was told that additional documentation had already been sent to Defendant.[16]   Defendant again requested that Plaintiff advise when her appeal submission was complete.

On April 4, 2004, Defendant documented through a letter sent to Plaintiff's counsel  that it had been told that Plaintiff would submit MRI results, but that those results had not yet been received.[17]  Defendant requested that Plaintiff advise it when her appeal submission was complete. On April 28, 2004, Plaintiff's counsel submitted records from Neurological Associates of Northeast Arkansas, including MRI test results.[18]   On April 20, 2004, Plaintiff's counsel submitted records from the Mississippi County Primary Care Clinic.[19]

On June 8, 2004, Defendant faxed a letter to Plaintiff's counsel inquiring about Plaintiff's worked hours and earnings during 1999 and 2000 so Defendant could "assess if an earlier date of disability . . . is warranted."[20] That same day, Defendant also sent a letter to Plaintiff's counsel stating that Defendant would require an extension of time to complete its review of Plaintiff's third appeal.[21]

-----

[16]Doc. 9-2, PR-G044.

[17]*Id.* at PR-G046.

[18]*Id.* at PR-G174.

[19]*Id.* at PR-G171.

[20]*Id.* at PR-G047.

[21]*Id.* at PR-G-50, 52, 54.

On September 23, 2004, as Defendant continued to review Plaintiff's claim, Defendant faxed a letter to Plaintiff's employer requesting information relevant to Plaintiff's claim such as salary increases, return to work dates, etc.[22]  In a December 2004 letter to Plaintiff's counsel, Defendant explained that it required an extension of time because it was "waiting for some additional information from [Plaintiff's] employer."[23]  On February 14, 2005, Defendant faxed a letter to Plaintiff's attorney stating, "[w]e apologize for the delay for a decision but we are trying to reach a decision [by] this Friday."[24]  Defendant faxed another letter to Plaintiff's counsel that day requesting that Plaintiff's attorney confirm some information pertaining to Plaintiff's medical leaves from work.[25]  Finally, on February 22, 2005, Defendant sent Plaintiff's counsel a letter explaining its reasoning for upholding its decision to deny LTD benefits.[26]  Plaintiff filed suit two months later in April 2005.

## II.    Standard of Review

ERISA affords a plan beneficiary the right to a judicial review of a benefits determination.[27]  Such cases are not to be determined under the usual standard for granting summary judgment.[28]  The Court must decide whether benefits were properly denied based on a review of the record presented

---

[22]Doc. No. 9-2, PR-G056.

[23]*Id.* at PR-G059.

[24]*Id.* at PR-G061.

[25]*Id.* at PR-G063.

[26]*Id.* at PR-G064.

[27]*See* 29 U.S.C. § 1132(a)(1)(B).

[28]Fed. R. Civ. P. 56(c); *see Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir.1998).

6

to the administrator, under the appropriate standard. A court reviewing an administrator's decision denying benefits should apply a *de novo* standard of review unless the plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms.[29]  If a plan gives the administrator discretionary authority, then a court should review a plan administrator's decision only for abuse of discretion.[30]   If supported by substantial evidence, the decision "should not be disturbed even if a different, reasonable interpretation could have been made."[31]

To change the standard of review, "[a] claimant must offer evidence that 'gives rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim' to apply the less deferential standard."[32]  To invoke this standard, any alleged procedural irregularity must be so egregious that it might create a "total lack of faith in the integrity of the decision making process."[33]

The Plan at issue in this case provides discretionary authority to the Plan Administrator to interpret the plan terms. However, Plaintiff argues that a *de novo* standard of review should be used for two reasons: (1) Defendant disregarded the time limits imposed by the plan and by federal regulations; and (2) Defendant was both the underwriter and claims administrator, a conflict of interest exists.

---

[29]*Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[30]*Id*. at 115; *Cox v. Mid-America Dairymen, Inc*., 965 F.2d 569, 571 (8th Cir. 1992), *aff'd after remand*, 13 F.3d 272 (8th Cir. 1993).

[31]*See Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997).

[32]*Chronister v. Baptist Health*, 442 F.3d 648, 654 (8th Cir. 2006).

[33]*Layes v. Mead Corp*., 132 F.3d 1246, 1251 (8th Cir. 1998).

To promote the prompt resolution of benefit claims, ERISA regulations require a claims administrator to resolve an appeal within 120 days.[34]  Defendant's Plan states that "[t]he Prudential Appeals Review Unit shall make a determination on your claim appeal within 45 days of your appeal request.  This period may be extended by 90 days if Prudential determines that special circumstances require an extension of time."[35]  The Regulation provides that the plan administrator notify the claimant of its determination " . . . within a reasonable period of time, but not later than 45 days after receipt of the claim by the plan.[36]  This period may be extended by 30 days, provided the plan administrator determines such an extension is necessary due to matters beyond the control of the plan . . ." and requires that the claimant be notified before the expiration of the 45 days.[37]  A second 30 day extension is provided again if the extension is made necessary due to matters beyond the plan's control and provided that notice is given before the end of the first extension.[38]

Plaintiff argues that Defendant took six thirty-day extensions and after the sixth extension letter did not render a decision for 105 days.[39]  Although not specifically adopted by the Eighth Circuit, many other courts have held that as long as there is "an ongoing, good faith exchange of information between the administrator and the claimant, inconsequential violations of the deadlines

---

[34]*See* 29 C.F.R. § 2560.503-1(h)(1)(i).

[35]Doc. 9-2, PR-G010.

[36]*Id.*

[37]*Id.*

[38]*Id.*

[39]Doc. No. 16.

or other procedural irregularities generally do not entitle the claimant to *de novo* review."[40]   Sixty

or 120-day deadlines should not be give such significance that manipulation of deadlines could be

employed tactically by either ERISA claimants or plan administrators.[41]   As the Tenth Circuit

recently noted in *Gilbertson*, ERISA is designed "to promote a good-faith bilateral exchange of

information on the merits of claims, not hasty decision making by administrators so as to slip under

the 120-day wire or delay by claimants so as to ensure a deemed denial."[42]

Defendant argues that "the mere presence of an alleged procedural irregularity is not enough

to strip a plan administrator of the deferential standard of review." I agree.  As shown above, the

parties engaged in a mutually beneficial on-going good faith effort to resolve the claim.

Plaintiff next alleges that a conflict of interest exists because Defendant is both the claim

insurer and administrator.   However, in order to find a conflict of interest that would alter the

standard of review, Plaintiff must present "material, probative evidence demonstrating that a

palpable conflict of interest existed, which caused a serious breach of the administrator's fiduciary

---

[40]*Abatie v. Alta Health & Life Ins. Co.*, ___ F.3d ___, 2006 WL 2347660 (9th Cir. 2006); *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 392-93 (5th Cir.2006) (applying a substantial compliance standard to alleged procedural violations under ERISA); *Lamantia v. Voluntary Plan Administrators, Inc.*, 401 F.3d 1114 (9th Cir. 2005); *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir. 2003); *accord Jebian v. Hewlett-Pakcard Co. Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098 (9th Cir. 2003).

[41]*Id.*

[42]*Gilbertson*, *supra* at 635.

duty."[43]  Plaintiff offers no such evidence, therefore I will review the plan administrator's decision

for an abuse of discretion.

## III.    Analysis

Defendant denied Plaintiff LTD benefits based on its policy language, which states that an

employee is disabled when an employee is ". . . unable to perform the material and substantial duties

of [the] regular occupation due to your sickness or injury; *and* [has] a 20% or more loss in . . .

indexed monthly earnings due to that sickness or injury."[44]  Material and substantial duties are

defined as those which "are normally required for the performance of [the] regular occupation; and

cannot be reasonably omitted or modified," unless the employee is required to work on average in

excess of 40 hours per week, "Prudential will consider you able to perform that requirement if you

are working or have the capacity to work 40 hours per week."[45]  Finally, regular occupation is

defined as "the occupation [the employee is] routinely performing when [the] disability begins.

Prudential will look at [the] occupation as it is normally performed instead of how the work tasks

are performed for a specific employer or at a specific location."[46]

In its findings, Defendant determined that there was "insufficient documentation of an

impairment preventing [Plaintiff] from performing the material and substantial duties of [her] regular

---

[43]*Farley v. Blue Cross &Blue Shield*, 147 F.3d 774, 776 (8th Cir. 1998); *Chrinister v. Baptist Health*, 442 F.3d 648, 655 (8th Cir. 2006) (*quoting McGarrah v. Harford Lif e Ins. Co.*, 234 F.3d 1026, 1030 (8th Cir. 2000)) ("[I]t is wrong to assume a financial conflict of interest from the fact that a plan administrator is also the insurer.").

[44]Doc. No. 9-2, PR-G017 and PR-G084. (Emphasis added).

[45]*Id.*

[46]*Id.*

10

occupation."[47]  Because Plaintiff had been working in the same position at American Greetings since January 20, 2000, Defendant held that Plaintiff was not permanently disabled in February 2002 since the only reason she stopped performing her job was because American Greetings opted to no longer accommodate her in that particular position. Defendant is correct.

Plaintiff argues that her disability began in January 2000, when she returned to an accommodated position at American Greetings due to her carpal tunnel diagnosis.  By the Plan's definition, Plaintiff's disability could not begin until two conditions had been met: (1) she was unable to perform the material and substantial duties of her regular occupation due to illness or injury; and (2) she had a 20% or more loss .. . in indexed monthly earnings due that the same illness or injury.  Because American Greetings gave Plaintiff an accommodated position in January 2000, she did not suffer a 20% or more loss in monthly income. The Eighth Circuit has clearly held that a plaintiff carries the burden of proving disability under a given plan.[48]  Because Plaintiff has not submitted evidence of a loss of income, Plaintiff has not shown that her disability began in January 2000.

Defendant's finding that Plaintiff's disability didn't begin until February 2002, when she suffered a 20% or more loss in monthly wages when her accommodated position was eliminated, was not arbitrary.  Again, the Plan defines "regular occupation" as "the occupation you are routinely performing when your disability begins."[49]  Plaintiff's disability began when her monthly income

---

[47]Doc. No. 9-2 at PR-G018 and PR-G084.

[48]*James v. Kansas City Chiefs Football Club, Inc., et al*., No. 02-0031CV-W-HFS, 2005 WL 1532945 (W.D. Mo., June 28, 2005) (*citing Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)).

[49]Doc. No 9-2, PR-G084.

11

dropped by 20% or more.  Plaintiff stopped working, not because of the disability, but because American Greetings changed its accommodation policy and eliminated her accommodated position. Accordingly, Defendant has shown that its application of the policy language to Plaintiff was not arbitrary.

**IV.     Conclusion**

Based on the above, Defendant's decision to deny benefits is AFFIRMED.  Plaintiff's Motion for Summary Judgment is DENIED.  Defendant's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED this 5th day of September, 2006.

/s/Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE